UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
ELEANOR GRAZIANO,

                          Plaintiff,          MEMORANDUM & ORDER
                                              17-CV-1349(JS)(AKT)
           -against-

FIRST CHOICE MEDICAL, PLLC, and LISA
COHEN and DR. LAWRENCE GOLDMAN, M.D.
individually and in their official
capacities and aiders and abettors,

                          Defendants.
------------------------------------X
APPEARANCES
For Plaintiff:        Matthew Scott Porges, Esq.
                      Law Office of Matthew S. Porges, Esq.
                      641 President Street, Suite 205
                      Brooklyn, New York 11215

For Defendants:       Joshua S. Beldner, Esq.
                      Eric S. Tilton, Esq.
                      Tilton Beldner LLP
                      193 East Main Street
                      Babylon, New York 11702

SEYBERT, District Judge:

           Plaintiff Eleanor Graziano ("Plaintiff") alleges that

defendants First Choice Medical, PLLC ("First Choice"), Lisa Cohen

("Cohen"), and Dr. Lawrence Goldman, M.D. ("Dr. Goldman")

discriminated against her due to her pregnancy in violation of

Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e et

seq.) ("Title VII"), the New York State Human Rights Law (N.Y.

EXEC. LAW § 290 et seq.) ("NYSHRL"), and the Suffolk County Human

Rights Law (Suffolk County Administrative Code § 528-7) ("County

Code"). (Am. Compl., D.E. 14.) Presently pending before the Court

is Defendants' motion for summary judgment and attorneys' fees. (Def. Mot., D.E. 53.)  For the following reasons, Defendants' request for summary judgment is GRANTED and their motion for fees is DENIED.

## BACKGROUND

I.  Factual Background[1]

---

[1] Unless noted, all facts are undisputed.  However, at the outset, the Court must address issues with the parties' Rule 56.1 Statements.  In Plaintiff's Counterstatement, she often admits that a party wrote what is quoted or testified to what is quoted in Defendant's Rule 56.1 Statement.  These statements by Defendant, to the extent otherwise admissible, are "deemed to be admitted for purposes of the motion [because they are not] specifically controverted by a correspondingly numbered paragraph in [Plaintiff's] statement . . ."  Local Rule 56.1(c).

Additionally, Defendants filed several "written statements" and emails from employees in support of their motion.  (See Tilton Aff., D.E. 55, 55-6, 55-7, 55-8, 55-9.)  For example, in one email, from "lisn3@optonline.net" to "rakpc1@aol.com," an individual who typed "Dr. Deborah Schaeffer" at the bottom of the email writes "I was asked to write down things about Eleanor Graziano Hope this is ok."  (D.E. 55-9.)  As "[e]ach statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)[,]" and the Court has serious concerns about the admissibility of these written statements and emails, the Court will not consider them on this motion.  The Court will, however, consider the following: Plaintiff's Deposition (Graziano Dep., D.E. 55-1, pp. 1-71 & D.E. 55-2, pp. 78-153); Dr. Goldman's Deposition (Goldman Dep., D.E. 55-3); Cohen's Deposition (Cohen Dep., D.E. 55-4); and Fontana's Deposition (Fontana Dep., D.E. 55-5).  The Court will also consider the Declarations of Dr. Goldman (Goldman Decl., D.E. 56) and Cohen (Cohen Decl., D.E. 57), which are both signed statements made "under penalty of perjury."

At various points over the years, First Choice had three offices: Riverhead, Holbrook, and Eastport. Since 2001, Dr. Goldman has been the sole owner of the practice. (Def. Rule 56.1 Stmt. ("Def. Stmt."), D.E. 54, ¶¶ 1-9.) Plaintiff began working for First Choice in October 2003 as a front desk worker in the Riverhead office. A few years later, she was transferred to the billing department. In both positions, she reported directly to Adeline Fontana ("Fontana"), the Riverhead office manager. (Def. Stmt., ¶¶ 17-18, 20-21, 24.) All employees at the Riverhead office reported to Fontana, who reported directly to Dr. Goldman. (Def. Stmt. ¶ 16.) Shortly thereafter, Plaintiff was promoted to assistant office manager. In that position, she had supervisory authority over the Riverhead office's front desk workers and medical assistants and was in charge when Fontana was not present. (Def. Stmt. ¶ 25-27.) In 2012, First Choice closed its Riverhead office. (Def. Stmt. ¶ 28.) Fontana became the office manager of the Holbrook office and Plaintiff became the assistant office manager of the Holbrook office. (Def. Stmt. ¶ 31.) From 2003 to 2017, Cohen was the office manager in Eastport. (Def. Stmt. ¶ 12.)

A.    Plaintiff's Job Performance

The record demonstrates that Plaintiff had issues with coworkers and patients well before she announced her pregnancy. Dr. Goldman testified that Plaintiff "had not been acting appropriate with staff, she had been nasty." (Goldman Dep. 31:15-

17.) Employees complained about Plaintiff being rude, which Fontana had to deal with as office manager. (Def. Stmt. ¶ 87.) At first, Fontana supported Plaintiff because she believed she was just enforcing the rules; however, there came a point when she "no longer could defend her." (Fontana Dep. 71:4-15.) Cohen testified that Plaintiff "wasn't performing her job as an assistant manager. She was being aggressive and abusive with the employees and she had reprimand issues." According to Cohen, Dr. Goldman did not attribute these issues to Plaintiff's pregnancy because they had "been going on for years." (Cohen Dep. 27:9-21.) At her deposition, Plaintiff admitted that her behavior toward her colleagues was inappropriate at times and acknowledged patient complaints against her. (See, e.g. Def. Stmt. ¶¶ 41-42, 54-57, 66-67, 73-74.) On January 16, 2015, Fontana warned Plaintiff that if one more complaint was received against her, she would be fired. (Def. Stmt. ¶ 114.)

Dr. Goldman and Fontana decided to remove Plaintiff as assistant office manager at the "end of 2014, beginning of the year in [20]15 . . . before . . . the announcement of [her] pregnancy." (Goldman Dep. 33:24-34:13.) Plaintiff testified that she was not informed of the demotion until January 27, 2015. The title was taken away because "she was having bad conversations-- she was abrupt with the staff. She was abrupt with patients. She was condescending to a lot of the staff. She was--her human

4

resources skills were very in question." (Goldman Dep. 34:21-35:4.) There was no corresponding reduction in salary or benefits. (Def. Stmt. ¶ 91.) Plaintiff claims that when she lost her assistant office manager title, Dr. Goldman told her he was demoting her because she was "hormonal." (Graziano Dep. 95:10-23.) Dr. Goldman denies ever telling her she was hormonal. (Goldberg Dep. 44:23-45:2). Cohen never heard Dr. Goldman call Plaintiff hormonal. (Cohen Dep. 27:25-28:3.)

When asked why he did not terminate Plaintiff due to her performance issues, Dr. Goldman answered that "she had a situation at home where her husband had been unemployed for lengths of time, pregnancy, for a variety of reasons I chose to keep her and maintain her employment. I had known her for upwards of almost 15 years at that point. You don't trash a long-term relationship." (Goldman Dep. 41:17-24.)

B. <u>Plaintiff's Pregnancy Announcement and Leave</u>

Plaintiff learned she was pregnant in December 2014. She told Dr. Goldman at some point in January 2015, and he said "mazel" or "congratulations." (Def. Stmt. ¶¶ 95-97.) Plaintiff also attempted to make an announcement to her other colleagues at a billing meeting in January 2015, but she was emotional and unable to get the words out, so Fontana announced it to everyone. Everyone seemed happy for her. (Def. Stmt. ¶¶ 109-11; Graziano Dep. 65:20-66:17.)

Plaintiff states that at this same meeting, Cohen told her that she might not have a job to return to because of a new computer program. (Graziano Dep. 66:23-67:8; 69:8-14.) Dr. Goldman stated that Plaintiff "would have to be trained when she returned" but that it would not "take away any of the work she was doing." (Goldman Dep. 33:19-23.) Cohen similarly testified that Plaintiff would have been trained on the program and required to use it when she returned; she denies telling Plaintiff that the program might mean she would not have a job to come back to. (Def. Stmt. ¶¶ 147-48.)

Although the timing is less than clear from the parties' submissions, it appears that Dr. Goldman and Fontana decided to demote Plaintiff before she announced her pregnancy; Fontana told Plaintiff on January 16, 2015 that she would be fired if there was one more complaint against her before the billing meeting where she announced her pregnancy to the staff; she announced her pregnancy to Dr. Goldman in mid-January 2015; the billing meeting occurred sometime in mid-January 2015; and Plaintiff was informed of her demotion on January 27, 2015.

Dr. Goldman testified he "think[s] people can get pregnant whenever they want to and it's a beautiful thing." (Goldman Dep. 28:7-9.) Approximately 13 women who worked for Dr. Goldberg over the years became pregnant, went out on maternity leave, and returned to work. (Def. Stmt. ¶ 104.) Plaintiff had

never seen anything that would suggest Dr. Goldman was anything but happy for a pregnant employee.  (Def. Stmt. ¶ 102.)  Plaintiff also believed Dr. Goldman was happy for her personally.  (Def. Stmt. ¶¶ 98, 101.)[2]

On February 4, 2015, Plaintiff was admitted to the hospital for pre-term labor.  She stayed for five days and was on bed rest for the remainder of her pregnancy.  She returned for a scheduled C-section on February 26, 2015.  (Def. Stmt. ¶¶ 116-19.)

Plaintiff applied for short term disability benefits on February 9, 2015.  The benefits were set to expire on Friday, April 24, 2015.  She was scheduled to return to work the following Monday, April 27, 2015.  Plaintiff reached out to Fontana in mid-March and told her she wanted to return to work on April 27.  (Def. Stmt. ¶¶ 117, 120-21.)

Sometime later, Cohen, Fontana and another employee took a few personal items Plaintiff had left in her desk and boxed them up.  These included documents related to Plaintiff's daughter, personal bills, snacks, and a cup.  They removed the items because

---

[2]    The deposition transcript reads as follows:
Q:    Based on your conversation . . . did you think that [Dr. Goldman] was happy for you?
A:    I do. I never thought he was unhappy for me, we'll get that straight.
Q:    Okay.
A:    And that's the truth.
Q:    You never thought he was unhappy for you?
A:    I never ever thought.
(Graziano Dep. 64:24-65:9.)

someone else needed to use the desk while Plaintiff was out.
Fontana brought the box to Plaintiff's home. (Def. Stmt. ¶¶ 157-
61.)

At some point during her maternity leave, Plaintiff's
OB/GYN, who appears to have known Dr. Goldman, called him and told
him Plaintiff had indicated some job stress. Dr. Goldman replied
that Plaintiff was "lucky to have a job." He testified that he
made this comment because of Plaintiff's issues with her co-workers
and patients. (Def. Stmt. ¶¶ 153-55.) There is no indication
that he told the OB/GYN that she was lucky to have a job because
she was pregnant. According to Fontana, the OB/GYN said Dr.
Goldman told her he wanted to fire Plaintiff and had a "paper
trail." (Pl. Additional Stmt., D.E. 61-1 at 15-18, ¶ 20.) Dr.
Goldman disputes this. (Def. Counterstmt., D.E. 64, ¶ 20-20.1.)

C.   Plaintiff Does Not Return

According to Dr. Goldman, "when [Plaintiff] left, she
knew she had a job to come back to" and Plaintiff's "employment
finally came to an end [when] [s]he did not show up to work."
(Goldman Dep. 42:25-43:2, 42:2-4.) Fontana also believed that
Plaintiff would be returning to work on April 27, after her
maternity leave. Fontana resigned from First Choice in April 2015;
prior to leaving, she left a note in the office that said "El back
4/27," referring to Plaintiff's anticipated return from maternity
leave. (Def. Stmt. ¶ 123.)

In April, Cohen reached out to Plaintiff about her return. She spoke to Plaintiff's husband, who said Plaintiff would call Cohen back. (Def. Stmt. ¶ 124.) She called again on April 20 and left Plaintiff a voicemail: "Hi Eleanor, it's Lisa. It is almost 11:30 on Monday morning. If you can please give me a call back either in the Eastport office, I should be here for another, like hour or two or you can call me on my cell phone, I'm sure you have the number or you can give me a call later in Holbrook. I would appreciate it. I would love to talk to you. I just have a real quick question and hope all is well with you." (Def. Stmt. ¶ 125.) Plaintiff did not respond to the voicemail.

On April 21, Dr. Goldman texted Plaintiff: "I know that Lisa reached out to you yesterday. I would appreciate if you would call her sometime today." He followed up with "Hi. [I know] you read the message. Please contact Lisa by tomorrow the latest." Later that day, he wrote "Need to speak to Lisa to coordinate your hours." Plaintiff did not respond to any of Dr. Goldman's text messages. (Def. Stmt. ¶¶ 127-29.) The next day, he wrote "Please show up at Eastport Monday morning for work." She did not respond, and she did not show up to work on April 27 as scheduled. (Def. Stmt. ¶¶ 130-32.)

Plaintiff testified that she went on a job interview for another position on April 20. (Graziano Dep. 126:14-24.) She also filed a complaint against Defendants with the New York State

Division of Human Rights on April 24. (Def. Stmt. ¶ 200; Human Rights Complaint, Pl. Ex. 4, D.E. 1, at ECF pp. 14-25.)

Dr. Goldman did not believe Plaintiff had been terminated and he never told Cohen or Fontana to terminate her. (Def. Stmt. ¶¶ 140-42.) Plaintiff testified that no one at First Choice ever told her she was terminated. Dr. Goldman never told her she was terminated, Cohen never told her she was terminated, and Fontana never told her she was terminated. (Graziano Dep. 128:3-18.)

At some point, First Choice's bookkeeper wrote "terminated 4/27/15" on Plaintiff's personnel file. (Pl. Stmt. ¶ 18; Def. Counterstmt., ¶ 18.1.) In an unrelated case, that bookkeeper filled out a form for an investigative agency that stated that Plaintiff had been terminated on February 27, 2015. Next to "reason stated," the bookkeeper wrote "she never showed up for her shift." (Pl. Additional Stmt. ¶ 19; Def. Counterstmt. ¶ 19.1.) Defendants maintain that the February 27, 2015 date on the form was a typographical error. (Def. Counterstmt. ¶ 19.1.)

Regarding her failure to return, Plaintiff testified that

> I wouldn't have my job as assistant manager but I didn't want to go back to a hostile environment. I didn't want to go back to-- while I was out, I heard stories. Karen Merrill came to my home. You really don't want to come back there, it's not the same anymore. Lisa [Cohen] had became practice

```
        manager.³  I guess things have changed, rules
        must have changed.  I wasn't there so I don't
        know.  I just know from what I was told.
```

(Graziano Dep. 102:19-103:7.)

II.  Procedural History

Plaintiff filed a pro se Complaint on February 27, 2017.
(Compl., D.E. 1.)  On June 15, 2017, with counsel, she filed an
Amended Complaint.  (See Am. Compl.)  Defendants filed a motion to
dismiss, (see D.E. 19) which Judge Joseph F. Bianco denied,⁴
(Order, D.E. 34; Tr., D.E. 36).  Defendants now move for summary
judgment (see Def. Mot.); Plaintiff opposed (Pl. Opp., D.E. 61);
and Defendants replied (Def. Reply, D.E. 64-2).

DISCUSSION

I.  Legal Standard

A. Summary Judgment

Summary judgment will be granted where the movant
demonstrates that there is "no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."

---

³ The Court notes that Cohen testified that Plaintiff and Fontana
were "very close" (Cohen Dep. 36:11-12) and that in her New York
State Division of Human Rights Complaint, filed on April 24,
2017, she listed Fontana as a "friend" and contact person (Human
Rights Compl. at ECF p. 23).  Plaintiff had told Fontana she
would be returning in mid-March; as of April 17, apparently
coinciding with Fontana's resignation, Plaintiff no longer
wished to return.  (Graziano Dep. 115:13-116:8.)

⁴ After the summary judgment motion was fully briefed, the matter
was reassigned to the undersigned.

Fed. R. Civ. P. 56(a).  A genuine factual issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed 2d 202 (1986).  In determining whether an award of summary judgment is appropriate, the Court considers the "pleadings, deposition testimony, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).

The movant bears the burden of establishing that there are no genuine issues of material fact.  Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994).  Once the movant makes such a showing, the non-movant must proffer specific facts demonstrating "a genuine issue for trial."  Giglio v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at *4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation omitted).  Conclusory allegations or denials will not defeat summary judgment.  Id.  However, in reviewing the summary judgment record, "'the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"  Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

"[S]ummary judgment may be appropriate even in the fact-intensive context of discrimination cases," Westbrook v. City Univ. of N.Y., 591 F. Supp. 2d 207, 222 (E.D.N.Y. 2008) (internal quotation marks and citation omitted), and "the non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful," Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005); see also Baffa v. STAT Health Immediate Med. Care, P.C., No. 11-CV-4709, 2013 WL 5234231, at *7 (E.D.N.Y. Sept. 17, 2013) (in a pregnancy discrimination case, noting that "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact") (internal quotation marks and citation omitted).

B.  Discrimination Law

Title VII prohibits discrimination on the basis of gender, and "[t]he Pregnancy Discrimination Act amended Title VII's definition of gender discrimination to include disparate treatment "'because of or on the basis of pregnancy, childbirth, or related medical conditions.'" Baffa, 2013 WL 5234231 at *7 (quoting Title VII § 2000e(k) and citing Saks v. Franklin Covey Co., 316 F.3d 337, 343 (2d Cir. 2003)).  The Court will analyze Plaintiff's NYSHRL claims with her Title VII claims, "'as disparate treatment claims brought under Title VII . . . and the NYSHRL are [] analyzed under the same standard.'" Kizer v. Abercrombie &

Fitch Co., No. 12-CV-5387, 2018 WL 6106853, at *5 (E.D.N.Y. Nov. 20, 2018) (quoting Johnson v. Long Island Univ., 58 F. Supp. 3d 211, 220 (E.D.N.Y. 2014)).

Employment discrimination claims are analyzed under the burden-shifting framework the Supreme Court established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See also Ruiz v. Cty. of Rockland, 609 F.3d 486, 491 (2d Cir. 2010); Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008). That framework requires a plaintiff to first establish a prima facie case of discrimination. To establish a prima facie case of discrimination, a plaintiff must show that: "(1) [s]he is a member of a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to [an] inference of discrimination." Reynolds v. Barrett, 685 F.3d 193, 202 (2d Cir. 2012) (quoting Ruiz, 609 F.3d at 491–92). If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Holcomb, 521 F.3d at 138. Once the defendant employer provides such a reason, "the presumption of discrimination is rebutted and it simply drops out of the picture. The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that a reasonable jury could conclude

14

that more likely than not the employer's actions were motivated, at least in part, by a discriminatory reason." Baffa, 2013 WL 5234231 at *8 (internal quotation marks and citations omitted).

II. Application

Defendants concede that Plaintiff is a member of a protected class who was qualified for the position she held, satisfying the first two McDonnell Douglas factors, but argue that she did not suffer an adverse employment action under circumstances giving rise to an inference of discrimination, and thus has not established the third and fourth factors under prima facie test. (Def. Br., D.E. 58, at 10-11, 19-21.) They contend that even if the Court were to find Plaintiff established a prima facie case, they have offered legitimate non-discriminatory reasons for their acts and that Plaintiff has failed to show those reasons were pretextual. (Def. Br. at 21-23.)

Regarding adverse employment action, Plaintiff responds that although her "employment came to an end in a truly confusing manner . . . there was, in fact, a termination." (Pl. Opp. at 10.) In contrast, her Amended Complaint[5] states that she was "due to return to work . . . but did not do so. At that point, [she] had determined that she could not continue working for Defendants

---

[5] Defendants make much of the fact that Plaintiff's Amended Complaint asserted effective termination for the first time. The Court attaches little significance to this, as Plaintiff filed previous documents without the assistance of counsel.

because she could no longer tolerate Defendants' pregnancy-based harassment. However, prior to that date, [Plaintiff] had been effectively terminated."[6] (Am. Compl. ¶¶ 23-24.) As to the fourth element, she argues that there are genuine issues of material fact regarding whether she was terminated under circumstances giving rise to discrimination. (Pl. Opp. at 11.) Plaintiff does not address Defendants' claim that their actions were for legitimate non-discriminatory reasons related to poor job performance, but contends that the inconsistencies in Defendants' accounts of her employment demonstrate a pretext for pregnancy discrimination. (Pl. Opp. at 13-14.)

A. <u>Prima Facie Case</u>

1. <u>Adverse Employment Action</u>

Plaintiff concedes she was not formally terminated, acknowledging that she chose not to return. She appears to argue that she was effectively terminated. The Court does not agree.

A constructive discharge "occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the

---

[6] Plaintiff uses the phrase "effective termination." This Order uses that term interchangeably with "constructive termination" or "constructive discharge."

employee's shoes would have felt compelled to resign." Kalp v. Kalmon Dolgin Affiliates of Long Island Inc., No. 11-CV-4000, 2013 WL 1232308, at *9 (E.D.N.Y. Mar. 27, 2013) (quoting Serricchio v. Wachovia Sec. LLC, 658 F.3d 169, 185 (2d Cir. 2011)).

It is difficult to discern what hostile environment related to her pregnancy Plaintiff perceived while out on maternity leave that made her feel as though she could not return. To the contrary, she testified that everyone, including Dr. Goldman, was happy for her about her pregnancy. The Court notes that Plaintiff has not brought claims for a hostile work environment or retaliation. Her Amended Complaint alleges only that she was discriminated against based on her pregnancy because she was terminated. (Am. Compl. ¶¶ 26, 29.)

As to the specific issues raised by Plaintiff, first, whether Dr. Goldman made the hormonal comments presents an issue of fact, but it is not material. "[S]tray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination." Kizer, 2018 WL 6106853 at *6; see also Klein v. Safelite Grp., Inc., No. 16-CV-0726, 2018 WL 3105412, at *6 (D.N.J. June 25, 2018) ("the comment allegedly made by [a manager] to the effect that [an employee's] hormones were talking fails to establish that Defendant's reasons for terminating Plaintiff were pretext for pregnancy discrimination."). In the context of the entire record, including

17

Plaintiff's own admissions that Dr. Goldman was genuinely happy for her about her pregnancy, the comment is a stray remark.

Further, Plaintiff's reliance on what her obstetrician told Fontana about her conversation with Dr. Goldman is premised on inadmissible hearsay, and "[c]ourts do not consider inadmissible hearsay when resolving a summary judgment motion." Kizer, 2018 WL 6106853 at *5 (collecting cases where hearsay statements were not considered in employment discrimination matters). In any event, even if this Court were to consider it, Fontana testified that Dr. Goldman told the OB/GYN he wanted to fire Plaintiff and had a paper trail so he could do so. Fontana never stated that Dr. Goldman indicated he wanted to fire Plaintiff because she was pregnant. (Fontana Dep. Excerpt, D.E. 61-3, at ECF pp. 90-104, 50:19-52:25.)

Second, Fontana dropping off some personal items from Plaintiff's desk simply does not lend support to her claim that she was effectively terminated. Unrefuted evidence regarding the motivation behind this act shows that another employee was going to use Plaintiff's desk temporarily while she was out on leave, so they returned personal items to Plaintiff so they would not be misplaced or misused. Third, even if Cohen made the stray comment regarding the billing program and Plaintiff's job, the undisputed evidence shows that Cohen and Dr. Goldman reached out to tell Plaintiff she did have a job to return to, and she ignored them.

Last, the bookkeeper's notation on a form that Plaintiff had been terminated on February 27 can be nothing other than a typo. The "reason stated" was "she never showed up for her shift," which all parties agree occurred on April 27. And on Plaintiff's file, the same bookkeeper had written the termination date as April 27. Finally, as noted, Cohen and Dr. Goldman had contacted Plaintiff well after February regarding her anticipated return.

"These allegations, even when examined collectively, do not constitute employment conditions that were so intolerable that a reasonable person would have felt compelled to resign." Kalp, 2013 WL 1232308 at *10. And again, none of the issues Plaintiff complains of are linked to her pregnancy. As to the "hostile environment," Plaintiff testified that Cohen was disrespectful and abrupt with her and with other, non-pregnant employees. It was "not based on someone's pregnancy, [Cohen] was just rude to people." (Graziano Dep. 105:14-106:4). She also admitted that Goldman sometimes lost his temper, but it had nothing to do with her pregnancy. (Graziano Dep. 107:2-15.) And Plaintiff's belief that she did not have a job to come back to is once more completely belied by the fact that numerous attempts were made to confirm her return on April 27. Thus, Plaintiff was not terminated, nor was she effectively terminated, and has failed to demonstrate an adverse employment action necessary for a prima facie case of discrimination.

2. <u>Circumstances Giving Rise to Inference of Discrimination</u>

For the same reasons the Court does not find Plaintiff was effectively terminated, the Court finds that her employment did not end under circumstances giving rise to an inference of discrimination. The Court also notes that many First Choice employees returned to work after maternity leave over the years. <u>See</u> <u>Baffa</u>, 2013 WL 5234231 at *13 (noting that "uncontroverted evidence demonstrate[d] that [the] defendant treats pregnant employees . . . favorably"). Although Defendants "may not escape liability for discriminating against [Plaintiff] <u>simply</u> because it can prove it treated other members of [her] group favorably," <u>id.</u> (internal quotation marks and citation omitted; emphasis in original), this factor buttresses the Court's conclusion that any actions taken by Defendants here were related to Plaintiff's job performance and not her pregnancy.

B. <u>Legitimate Non-Discriminatory Reason and Pretext</u>

As discussed, this Court does not find that Plaintiff suffered an adverse employment action under circumstances giving rise to an inference of discrimination, and thus concludes she has not made out a <u>prima</u> <u>facie</u> case. However, even if the Court were to assume Plaintiff had made out a <u>prima</u> <u>facie</u> case, Defendants have offered legitimate, non-discriminatory reasons for their actions. The Court has already recounted Plaintiff's pre-

pregnancy performance and discipline issues.  Although the Court does not conclude that any adverse employment action took place, even if it were to assume an adverse action took place, Defendants have given legitimate reasons for it.[7]

In sum, the Court concludes that there was no adverse employment action under circumstances giving rise to an inference of discrimination, and Plaintiff has thus failed to make out a prima facie case of employment discrimination.  Further, even if she had made out a prima facie case, Defendants have demonstrated legitimate, non-discriminatory, and non-pretextual reasons for their actions.  Defendants are entitled to summary judgment on Plaintiff's federal and NYSHRL claims.  Finally, the County Code section listed in Plaintiff's Amended Complaint states that it is an unlawful discriminatory practice "[f]or an employer to compel an employee who is pregnant to take a leave of absence."  Suffolk County Human Rights Law § 528-7.  This did not occur here, and Defendants are also entitled to summary judgment on the County Code claim.

---

[7] Plaintiff makes no specific argument regarding her demotion. In any event, the Court notes that "'while timing may be sufficient to establish an inference of discrimination, the close proximity of a termination [or, as here, demotion] to the plaintiff's announcement of her pregnancy alone is insufficient to demonstrate a pretext.'"  Baffa, 2013 WL 5234231 (quoting Forde v. Beth Israel Med. Ctr., 546 F. Supp. 2d 142, 152 (S.D.N.Y. 2008)).

III. <u>Fees</u>

Defendants seek attorneys' fees and costs from Plaintiff because the action is "frivolous, unreasonable, and without merit." (Def. Br. at 23.) "[I]f the prevailing party [in a Title VII action] is the defendant, attorneys' fees will only be awarded if the plaintiff's claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." <u>Valenti v. Massapequa Union Free Sch. Dist.</u>, No. 09-CV-0977, 2012 WL 1038811, at *20 (E.D.N.Y. Mar. 28, 2012) (internal quotation marks and citation omitted). The Court does have serious concerns with Plaintiff's continued litigation of this case. However, although Plaintiff has not ultimately prevailed, the Court believes that the proffered reasons for her belief that she was discriminated against--the hormonal comment, the computer program comment, and the box of her belongings-- arguably demonstrate a good-faith basis for her position that she was effectively terminated. "In short, even though the basis for this lawsuit was extremely thin and the unsuccessful opposition to the summary judgment motion was very weak, the Court does not believe attorneys' fees are warranted under the particular circumstances of this case." <u>Valenti</u>, 2012 WL 1038811 at *21.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (D.E. 53) is GRANTED in its entirety on all

claims, and the Amended Complaint is DISMISSED in its entirety.
Defendants' motion for attorneys' fees is DENIED.  The Clerk of
the Court is directed to enter judgment accordingly and mark this
case CLOSED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     September __13__, 2019
           Central Islip, New York